to be argued, which is C.E. v. Chappaqua. Thank you very much, General. Thank you. Are we all set, Mr. Hoffman? Yes. Good morning, Your Honors. I'd like to concentrate on the BIP, or the Behavior Intervention Plan in this matter, that was drafted in the 2010-2011 school year and that was intended to be used in the 2011-2012 school year and in the 2012-2013 school year. The question arises as to whether or not the parent's complaints regarding the use of this BIP a year later or two years later in the case of the second school year were retrospective and speculative complaints. And the district itself, the appellee itself, on page 45 of their brief, admits that the prior BIP took nearly an entire school year to develop and was not implemented until May of 2011 when the parents had asked for a new BIP in October of 2010. This was while the boy still was in the public school? The second year he was in the private school. The first year he was in the public school. All right. Okay. Right. So isn't it more difficult in that second year to update it if he's now in the private school? I know there was consultation with the private school teacher. Well, I don't think that it's a problem to update it with the consultation of the private schools. And if you look at RE, Your Honor, in particular, RE describes, although it's not the law in the case, but it describes how the New York City Department of Education develops BIPs well before the school year begins even though the student is matriculated either at Rebecca School or at some other school. I forget the name of it, the McCartan School. And in those cases, they were able to do it. And while one of them was rejected in RE, the other one didn't seem to be rejected. So that those are not necessarily unable to be done without the student in the school. So is your argument about the BIP just about timing or the substance of it? It seems to be a pretty substantial BIP by Dr. O'Sullivan, right? Right. I don't disagree that it was a substantial BIP for 2010 and 2011 when it was developed and what it was developed for. I don't agree that a BIP in particular two years later, with all the data that was available to the school district, could in any way be appropriate or that there could have been an FBA done in that period of time either. What in the record shows that it wasn't appropriate? What in the record shows it wasn't? What in the record shows you just said I don't think it was appropriate, but about these education cases, we give a lot of deference to the educational professionals with regard to their exercise of their judgment. What in the record shows that it was inappropriate? I think what shows in the records that it was inappropriate were the changes that actually happened in DE in that time period that those two years went by. And inevitably, any child is going to change in that time period. And I think that's spelled out in the records and I think it's spelled out in his performance reports that came from the Franklin Academy. For instance, many of the behaviors that were presenting when he was in a public school didn't present in a private school. And that's in the record. I'd also like to, with regard to... Would you argue also that the school district wouldn't carry through on the BIP? Well, that's part of our argument. And the reason I don't believe that that's speculative is very important. And in RE, there's a footnote on page 187, 694F3 at 187, footnote 3, which in particular states that evidence that a school district did not follow the IEP as written might be relevant in a later proceeding to show that the child was denied faith because necessary services in the IEP were not provided in practice. Now, the court in RE cites to an Eighth Circuit decision and a Ninth Circuit decision, to be fair with the court. But it is opening up the possibility that, in that context, that this would, and in a past performance, if it takes a year from October, a school year. I'll be more, again, be fair. If it takes from October when you start a BIP until April to get an FBA and a BIP ready, and then in May of that same school year to provide the service under the BIP, that to me is problematic. And it is history, and it's not speculative. So that the following year, the parents, what do they expect? They expect what they already know. The only basis would be it took too long to develop the BIP. So we believe the school district isn't going to perform under it. Is there anything else other than that? It's not just that they're not going to perform under it. So here in 2011 and in 2012, the school district says to the parent, we will modify the BIP immediately when you get to school. But the reality is, and the history is, and we play this out in one of the briefs, that there are three times that this happened over the period of time that this young man was in the Chappaqua schools, that in those three years, each time it took, similar to the 2010-11, nearly eight months to modify a BIP or to come up with a new BIP. A student shouldn't have to wait for that. A parent shouldn't have to wait for that. And if there are other questions in this appeal, if there are other questions that you want me to address, I can. Well, you've got a few minutes reserved. Why don't we wait and see what the school district has to say and get back to you. Thank you. Mr. Rushfield. Thank you, Your Honor. I'd like to actually start with a different issue, which is the issue of subject matter jurisdiction and the SRO's decision initially dismissing the appeal. Did the SRO have the authority to accept the documents? I think he had the authority to accept it. But did he have the authority to dismiss the appeal? Does the regulation give him the authority to dismiss the appeal? I believe it does. It doesn't. It just says he can reject them. If the appeal is untimely, the regulation is giving him the authority to dismiss the appeal. But the regulation with regard to formatting does not give him the authority to dismiss it. So I don't understand. I understand that you want to win on subject matter jurisdiction, but I think it makes no sense to me. He could have rejected them, but it doesn't give him the authority to dismiss. And that's what makes it different from all the cases, that you rely on, which talk about timeliness. Timeliness, the hearing officers are able to dismiss. It's not timely. But he doesn't have the authority to do that. I understand the Court's argument. I don't want to belabor it. I just wanted to make sure. I wouldn't belabor it either. So I've got a different question. And so what? He then went on to say, but I'm going to resolve the merits anyway. So why not, in fairness, at least look at that? Well, I don't think the question, in my mind, wasn't a matter of fairness. The question, in my mind, was a matter of if the Court dismissed, if the Court's administrative agencies will occasionally, especially on an appellate matter, dismiss, but they may talk about the merits. But the dismissal on a procedural ground still stands. Now, I understand what the Court has mentioned about a question about whether the regulations he could dismiss the appeal, but he did dismiss the appeal. At least that's what he literally said. And so our argument was that if the appeal is dismissed on a procedural ground, then there's been no exhaustion. But I understand the dichotomy in the regulations, and I don't want to belabor that point. But I believe that, apart from that, if you have a dismissal on a procedural ground, that shows there's a lack of exhaustion of that administrative remedy, even if the SRO is, in this case, in the alternative, that addresses the merits of the appeal. Going to the functional behavioral assessment, behavioral improvement plan issue raised by counsel, what we had here was an April 2011 BIP, which included a functional behavioral assessment. There doesn't seem to any longer be an argument about that fact. The — in any event, the portions of the BIP that included the functional behavioral assessment are identified by the SRO. They're at A108 to A109 in his decision. And then there were the six strategies, which really are the BIP itself, what we're going to implement. That BIP, the April 2011 BIP, was for the 2011-2012 school year. It was in place and ready to go should the student attend our schools. The student was pulled out of our schools and went to Eagle Hill instead. Concerning the 2012-13 school year, the SRO found that the evidence established that the student continued to exhibit the same kind of deficits, the same kind of resistant refusal behaviors they had in the past. But Ms. Wright had testified to that, hadn't she? Yes. That's at 1397 of the appendix. I believe so, Your Honor. So we have the same behaviors. We have no opportunity to see the student in Eagle Hill and be — well, we have an opportunity to see the student in Eagle Hill, but the Eagle Hill circumstance isn't going to translate, obviously, to a public school system. Eagle Hill is going to have a smaller class. The argument is no different than if you had a student with five students in one classroom — in one school — one classroom school, that you could somehow put together a behavioral assessment and a behavioral improvement plan for when he's going to be in a class with 20 students in a large school. It doesn't translate. It certainly makes sense that what was going to be done here, according to the record, which is what was about that was going to happen, is that the 2011 — the April 2011 BIP, which was to be effective for 2011-2012, would be used at the beginning of 2012-2013. There was going to be a team meeting. There was going to be observations concerning implementation and utilization to see if we have to change the plan. There's no evidence, by the way, that — since there can't be — that the plan would have had to have been changed because the student never attends, which kind of gets to another issue relating to the same subject. The complaint about the BIP for 2012-2013 is in a situation where the student was never educated in our school for either 2011-2012 or 2012-2013. Case law says that such procedural error issues don't result in denial of a free, appropriate public education unless one of three things are met, one being that a finding that it impeded the student's right to a free, appropriate public education. Can't have happened here. The student didn't attend. Significantly impeded the parent's opportunity to participate in the decision-making process. Parents attended both IEP meetings. And, in fact, in the only statement we have about the original BIP, we have the father saying that he believes it will work fine, it would work if it's implemented. But there were later complaints by the father and the mother later on in the year that they didn't feel it was being implemented. Your opponent's point is that the proof doesn't establish that the new BIP was going to be executed in the way that it was written, and so, therefore, that constitutes an inadequacy of it. Because the new BIP, I mean, frankly, it doesn't do much with regard to what data there was available from his counselors at the Eagle School, Eagle Hill School. Eagle Hill School. But what it does do is provide for regular meetings between the counselors and teachers in terms of kind of updating and adjusting what their needs are. And their response to that is, well, they didn't do it before. Why would they do it now? We can't rely on it. Well, the not before dealt with a situation where we had an April 2011 BIP, which they started to try to put in place during that same school year. But it was designed, according to the record, for the 2011-2012 school year, which exists plenty of time to get all our ducks in a row to implement it in toto, as opposed to trying to implement it in parts as we're proceeding. But you just said in the past where there's a promise to do something, and clearly the school district's unable to perform that promise, that the promise isn't enough, haven't we? And I agree with the Court that that would certainly be the case. You say this is different. There's no evidence in this record that they couldn't do it. Nothing. Now, as this Court had stated in the M.W. decision rendered in 2013, and I paraphrase, where an IEP includes a BIP, which here it does, the parent should at least suggest how the lack of the functional behavior assessment resulted in the BIP's inadequacy or prevented meaningful decision-making, and that's lacking here. It should be noted, however, that though the RCRL and the Court didn't need to do so, the impartial hearing officer, under the three-prong analysis under Burlington, reached the second and third prongs. On the second prong, which is the issue that the appellant had the burden on, which is whether Eagle Hill School would provide an appropriate education to the student, the If the IHO's decision were to be upheld, even if the SRO's decision, which is more limited, were not, we'd have the same situation of denial of the appellant's claims. He found the IHO found that it wasn't a program that the Eagle Hill program was for students with language-based learning disabilities, an ADD. The student is autistic. It's not a program designed for him. The he mentioned there was no opportunity to interact with non-disabled peers. It would not meet a least restrictive environment requirement, least restrictive education requirement, though we acknowledge that's not a be-all for purposes of determining appropriateness of the Eagle Hill School. He had a student, an autistic student, who was going to be placed on a bus for three hours a day. And the hearing officer was quite clear on saying that was a highly inappropriate situation for an autistic student, like the student in this case. The Eagle Hill School combined grade levels. Students were not grouped in classes according to their similarity of needs. Nobody from Eagle Hill came to testify or was subpoenaed to testify to explain how Eagle Hill provided an appropriate education for this student. And I think that's actually quite damning. There's nobody from the school to explain the program or how it will benefit this student. And as the impartial hearing officer also noted, there were problems. The student had problems in dealing with rapid changes. And Eagle Hill had the same amount of interactions with staff that would be at Chappaqua. And also had to, the student there, as opposed to at Chappaqua, would have to navigate multiple buildings, which would be a difficulty for this child. The IHO also addressed the equities, the third prong. Basically, as I see, at least in terms of the record, concerning the first school year involved, 11-12, we have a situation where the parents had decided by June 10, 2011, that they were removing the student from Chappaqua and placing them in a school. And it's not until August 22 of 2011 that they voiced an objection to the IEP. The counsel has not, in his oral argument, raised a sleeping argument. I would simply say, based on, like, U.S. v. Barrios, there's no evidence that he actually did his – the IHO actually slept during the hearing. There's no evidence that he didn't render a ruling on something or didn't respond to an objection or anything of that nature. There's no evidence of any prejudice. This whole case is an overview all along. And we have transcripts and lots of them. And we have exhibits and lots of them. So all the evidence that was before the IHO was also before the SRO, was also before the court below, and was also before this Court. Thank you so much for your time. Mr. Rushfield, Mr. Hoffman, you have reserved some time. Mr. Rushfield likes to say that there's no evidence of the fact that somebody from Eagle Hill School testified. The founder of Eagle Hill School testified at the hearing. She was no longer employed by Eagle Hill, but she was – had a 35-year experience and was a founder of Eagle Hill and – or one of the two founders of Eagle Hill and spent an inordinate amount of time on the record explaining the program at Eagle Hill that was ignored completely by the hearing officer and by the SRO. In addition – and she was familiar with the student. She had also visited with the student, observed the student, similar to the way the school district had. It's also – my adversary talked about goals and how the goals were appropriate because they listened to the folks at Eagle Hill, which belies the fact that they could have easily done the very same thing as it concerned a behavioral intervention plan without any question. In addition, I have to go back to the BIP and the scenario. What the parent was complaining about in implementation was that it took nearly eight months each year to develop a BIP. And in that time, nothing was really being done with regard to this. So we were going to start with what was essentially, in 2011-12, a year-old BIP in September that, again, the district said they would modify and reshape and do, but the parent had the experience, not retrospective, the real experience of having waited eight months for a BIP the last time. And then, again, in 2012, the same thing is said again. The district says, we know that it has to be modified. It will be modified. You heard Mr. Rushfield say that. So in the context of modifying it, the parents waited again, going back to this experience that they had, eight months, nearly an entire school year, to have a BIP made and put into effect. That just doesn't work for a student with autism. It doesn't work for a student that needs, and that everybody agrees needs, a behavioral intervention plan. And I'll stop there. Thank you very much. All right. Thank you very much. We'll reserve decision on this case. I believe our next case is under Sibley.